COUNTY OF VILAS, Plaintiff-Respondent-Petitioner,

v.

Gilbert J. CHAPMAN, Defendant-Appellant.

Supreme Court

*No. 83–1883. Argued January 3, 1985.—Decided February 6, 1985.*

(Also reported in 361 N.W.2d 699.)

For the plaintiff-respondent-petitioner the cause was argued by *John D. Niemisto,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the defendant-appellant there was a brief by *James M. Jannetta* and *Getzin & Jannetta,* Hayward, and oral argument by *James M. Jannetta.*

WILLIAM J. CALLOW, J. This is a review of an unpublished decision of the court of appeals which reversed an order of the Vilas county circuit court, Judge James B. Mohr, which denied defendant's motion to dismiss a traffic complaint for lack of jurisdiction and ordered the entry of a judgment of conviction against the defendant. We reverse the court of appeals.

The parties have stipulated to the facts in this case. Gilbert J. Chapman is an enrolled member of the Lac du Flambeau Band of Lake Superior Chippewa Indians. At approximately 7:05 p.m. on March 2, 1983, Chapman was a passenger in a vehicle being driven on State Highway 47 within the boundaries of the Lac du Flambeau Indian Reservation. The State of Wisconsin has a valid easement or right-of-way for the maintenance of State Highway 47 on the reservation. The vehicle in which Chapman was a passenger was stopped by a Vilas county deputy sheriff. Chapman was in possession of a small quantity of beer in an open beer can. The officer issued a Wisconsin uniform traffic citation and complaint, charging Chapman with possessing open intoxicants in a motor vehicle, contrary to Vilas County Ordinance 110(6), adopting sec. 346.935, Stats.

On April 28, 1983, Chapman filed a motion to dismiss the complaint on the ground that the court lacked jurisdiction over him because he was an enrolled member of the Lac du Flambeau Band (Band) of Lake Superior

Chippewa Indians and the alleged violation had occurred within the boundaries of the band's reservation. The trial court concluded that Vilas county had jurisdiction to enforce its ordinance against Chapman. On August 18, 1983, the trial court entered an order denying Chapman's motion to dismiss. The court also ordered that a judgment of conviction be entered against Chapman as of August 15, 1983, and that Chapman be required to pay a forfeiture, penalty, and costs totaling $67.50.

Chapman filed a notice of appeal from the trial court's order on September 28, 1983. In reversing the trial court, the court of appeals noted that, in determining whether the county had jurisdiction over Chapman, the trial court had relied on *State v. Tucker*, 237 Wis. 310, 296 N.W. 645 (1941), which held that a federal government highway right-of-way grant to the state extinguished Indian title to the right-of-way and conferred upon the state the jurisdiction necessary to maintain and control the highway. *Id.* at 315–16. After the trial court entered its order in the instant case, the holding in *Tucker* which the trial court had relied upon was overruled by this court in *State v. Webster*, 114 Wis. 2d 418, 430, 338 N.W.2d 474 (1983). In *Webster* we held that the grant of a right-of-way neither extinguishes title in the Indians nor constitutes a general grant of jurisdiction to the state over the land constituting the right-of-way. *Id.* at 429–30. The court of appeals concluded that, under the reasoning of *Webster*, Vilas county did not have jurisdiction to enforce its traffic ordinance against Chapman. The county filed a petition for review with this court, and we granted the petition.

The issue presented for review is whether Vilas county has jurisdiction to enforce a noncriminal traffic ordinance against an enrolled member of the Lac du Flambeau Band of Lake Superior Chippewa Indians for an offense which occurred on a public highway within the boundaries of the Indian reservation.

The court of appeals was correct that our decision in *Webster* sets forth the analysis which must be used to determine whether a county ordinance may be enforced against an enrolled tribe member for acts occurring on the tribe's reservation. In *Webster* we discussed in some detail the analytical framework the United States Supreme Court has developed to determine whether states have jurisdiction over Indian country. We noted that the Supreme Court has rejected the view that the states are absolutely barred from exercising jurisdiction over tribal reservations and members. However, two barriers remain to the state's exercise of jurisdiction. First, the exercise of such authority may be preempted by federal law. Second, state jurisdiction may infringe upon the right of Indians to establish and maintain tribal self-government. *Id.* at 432. The Supreme Court has stated that "[t]he two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980).

As we also noted in *Webster*, the most recent Supreme Court case dealing with state jurisdiction over Indian reservations is *Rice v. Rehner*, 463 U.S. 713, 103 S. Ct. 3291 (1983), *reh'g. denied*, 104 S. Ct. 209. In *Rice* the Court stated that recent cases have established a trend away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance upon federal preemption. *Id.* at 3295. In discussing the relationship between the infringement and preemption inquiries, the *Rice* Court stated:

"The role of tribal sovereignty in pre-emption analysis varies in accordance with the particular 'notions of sovereignty that have developed from historical traditions of tribal independence.' . . .

"When we determine that tradition has recognized a sovereign immunity in favor of the Indians in some respect, then we usually are reluctant to infer that Congress has authorized the assertion of state authority in that respect ' "except where Congress has expressly provided that State laws shall apply." ' . . . If, however, we do not find such a tradition, or if we determine that the balance of state, federal, and tribal interests so requires, our pre-emption analysis may accord less weight to the 'backdrop' of tribal sovereignty." *Id.*

The first question under the *Rice* analysis is whether the Lac du Flambeau tribe has a tradition of tribal self-government in the area of traffic regulation on Highway 47 within the reservation. In *Webster* we concluded that the Menominee tribe did have such a tradition of self-government. At the time the traffic complaints were filed against Webster, the tribe had adopted the Menominee Law and Order Code which contained traffic regulation provisions which paralleled traffic regulations contained in the Wisconsin statutes. The Menominees prosecuted and imposed penalties for offenses through its own police department, court system, and jail. Menominee tribal police patrolled the roads on the reservation. Based on those facts, we concluded that the Menominees had a well-established tradition of tribal self-government in the area of traffic regulation.

■
The alleged tradition of self-government by the Lac du Flambeaus in this case is in marked contrast to the elaborate system of traffic regulation by the Menominees which was in place in *Webster*. Chapman concedes that the Lac du Flambeaus had no motor vehicle code in effect at the time of his offense. Subsequent to the time Chapman was charged, the tribe did enact a motor vehicle code and established a tribal court. It is undisputed, however, that at the time of Chapman's offense the tribe was not regulating tribal members in the area of traffic

regulation. In spite of this undisputed fact, the court of appeals found that the tribe did have a well-established tradition of self-government, including motor vehicle regulation. The court based its conclusion on the fact that the tribe currently has a motor vehicle code in force. The court stated, "[t]o conclude that unless the tribe has been regulating the traffic regulations for some time, it cannot do so now is beyond reason and precedent." Slip. op. at 5. The tribe's right to enact traffic regulations is not in dispute here. However, in determining whether a tribe has a tradition of self-government in a particular subject area, we must look at whether the tribe has historically engaged in self-government in that area. At the time of Chapman's offense, the Lac du Flambeau tribe had no traffic regulations or motor vehicle code. We thus conclude that the court of appeals incorrectly found that the tribe had a well-established tradition of self-government in the area of traffic regulation.

The next step under the *Rice* analysis is to evaluate the balance of federal, state, and tribal interest in the regulation of Highway 47. As we noted in *Webster,* the state clearly has a strong interest in regulating the use of public highways which it builds and maintains. The tribe also has a strong interest in regulating the use of roads within the reservation. We concluded in *Webster* that, where the state and the tribe had equivalent interests in traffic matters, the balance should tip in favor of the tribe. 114 Wis. 2d at 435. In our analysis in *Webster,* we had previously found that the Menominees had a well-established system of tribal government in the area of traffic regulation. If within the system of self-government the tribe has enacted laws and exercised governing authority in a given field of regulation, the balancing of interests tips in favor of the tribe. Where the tribe has no system of self-government in a given field of regula-

tion, however, we conclude that the balance of interests must tip in favor of the state. In this case the tribe had not acted in the field of traffic regulation. In the absence of any regulation by the tribe, the state has a strong safety interest in enforcing traffic laws against both Indians and other users of public highways. Thus we find in this case that the state has a dominant interest in regulating traffic on Highway 47 since the tribe had not evinced any interest in such regulation.

We next turn to the question whether the federal government has preempted state jurisdiction to regulate Highway 47 within the Lac du Flambeau reservation. In August of 1953 the United States Congress enacted Public Law 280, 67 Stat. 588 (1953), which, as amended, became present 18 U.S.C. sec. 1162 (1982). Public Law 280 gave certain states, including Wisconsin, jurisdiction over criminal offenses and civil causes of action involving Indians in Indian country. The parties agree that the ordinance violation with which Chapman was charged is neither a crime nor a civil cause of action but, rather, is a civil regulatory matter. The parties also agree that Public Law 280 does not address civil regulatory jurisdiction. The parties differ, however, as to the interpretation to be given to the silence on civil regulatory matters of Public Law 280. While Chapman urges that, because Public Law 280 does not specifically authorize civil regulatory jurisdiction, such jurisdiction is federally preempted, the county contends that the law's silence cannot be construed as preemption of civil regulatory jurisdiction.

The court of appeals, relying upon the analysis it had applied in *Sanapaw v. Smith,* 113 Wis. 2d 232, 335 N.W. 2d 425 (Ct. App. 1983), found that absent a specific federal grant of jurisdiction allowing the state to regulate Indian affairs on reservations, the presumption is that the state possesses no jurisdiction. We conclude that the

analysis applied by the court of appeals in this case and in *Sanapaw* conflicts with the most recent analysis of the subject applied by the United States Supreme Court.

Chapman relies on the United States Supreme Court's decision in *Bryan v. Itasca County*, 426 U.S. 373 (1976), to support his contention that, unless Congress has specifically afforded the states jurisdiction in a particular subject area, such jurisdiction has been federally preempted. The issue presented in *Bryan* was whether the State of Minnesota had jurisdiction to subject Indians living on reservations to a personal property tax. The Court concluded the state could not impose such a tax. In discussing Public Law 280, the Court stated, "if Congress in enacting Pub. L. 280 had intended to confer upon the States general civil regulatory powers, including taxation, over reservation Indians, it would have expressly said so." *Id.* at 390.

As we noted earlier in this opinion, the *Rice* case is the Supreme Court's most recent pronouncement on when states may regulate activities on Indian reservations. In *Rice* the Court held that California could require a federally licensed Indian trader who operated a general store on a reservation to obtain a state liquor license in order to sell liquor for off-premises consumption. In *Rice* the Court expressly stated that, when a tribe does not have a tradition of self-government in a particular subject area, "it is not necessary that Congress indicate expressly that the State has jurisdiction to regulate" in that area. 103 S. Ct. at 3301–02. Because *Rice* was written some six years after *Bryan*, we conclude that we must follow the Supreme Court's reasoning in *Rice* which rejected the notion that Congress must expressly grant jurisdiction before states may regulate in a particular area. Thus, since the Lac du Flambeau tribe had no tradition of self-regulation of traffic offenses, we do not

construe Public Law 280's silence as to jurisdiction over civil regulatory matters to constitute federal preemption of state jurisdiction over such cases.

Because we find there has been no federal preemption and because the Lac du Flambeau tribe had no tradition of self-government in the area of traffic regulation at the time of Chapman's offense, we hold that Vilas county had jurisdiction to enforce its ordinance against Chapman.

*By the Court.*—The decision of the court of appeals is reversed.

HEFFERNAN, CHIEF JUSTICE (dissenting). As the United States Supreme Court has acknowledged, its analysis of the power of states to regulate matters in Indian country, affecting Indians on reservations, has not been "static." *Rice v. Rehner,* 463 U.S. 713, 103 S. Ct. 3291, 3294 (1983). However, the Court consistently has held that state jurisdiction in Indian country depends on two considerations, the right of Indians on reservations to govern themselves and the power of the federal government to exert federal authority over Indian matters. *Rice,* 103 S. Ct. at 3294; *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142 (1980); *Bryan v. Itasca County,* 426 U.S. 373, 376 n. 2 (1976); *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164 (1973).

The "self-government" or "sovereignty analysis and the "federal pre-emption" analysis are intertwined in the Court's more recent decisions. The Supreme Court has described the Indian right of sovereignty as the "backdrop against which the applicable treaties and federal statutes must be read" in the federal pre-emption analysis. *McClanahan,* 411 U.S. at 172; *Rice,* 103 S. Ct. at 3295. The Court has recently explained the relationship between the considerations of tribal sovereignty and fed-

eral pre-emption in an analysis of the scope of state jurisdiction in the following terms:

"We have . . . employed a pre-emption analysis that is informed by historical notions of tribal sovereignty, rather than determined by them." *Rice, id.*

The *Rice* Court then expanded on how historical notions of tribal sovereignty inform the pre-emption analysis:

"When we determine that tradition has recognized a sovereign immunity in favor of the Indians in some respect, then we usually are reluctant to infer that Congress has authorized the assertion of state authority in that respect ' "except where Congress has expressly provided that State laws shall apply." ' *McClanahan, supra,* 411 U.S., at 171, 93 S. Ct., at 1261 (quoting U. S. Dept. of the Interior, Federal Indian Law 845 (1958) . . . ." *Rice,* 103 S. Ct. at 3295.

In other words, when there is a tradition or history of Indian sovereignty, it "may be repealed only by an explicit directive from Congress." *Id.* at 3296.

The majority correctly states this analysis (at 215), but, in my opinion, applies it in a way that is neither required nor warranted by the United States Supreme Court's decisions. The majority states, without citing authority, that "in determining whether a tribe has a tradition of self-government in a particular subject area, we must look at whether the tribe has historically engaged in self-government in that area." (At 216.)

As used by the United States Supreme Court, the term, "tradition of immunity or self-governance," means the same thing as "historical notions of tribal sovereignty," "the right of tribal self-government," and "notions of sovereignty that have developed from historical traditions of tribal independence." *Rice,* 103 S. Ct. at 3295. As I read *Rice* and other Supreme Court decisions, what

is required is not that the tribe have a history of regulation and enforcement in a particular area, but that it have a historical *right* of autonomy or self-regulation in that area. According to the majority—and I agree—the Band has the power to regulate civil traffic matters. I disagree with the majority's test of self-government. Its test is whether the Band has enacted laws on a particular subject matter. The power to regulate, the right to self-government, must include not only the power to decide to enact laws, but also the power to decide not to enact laws on that subject. Consequently, I believe that the majority's conclusion, that the Lac du Flambeau Band has no historical tradition of sovereignty in traffic regulation simply because it had no traffic regulations or motor vehicle code at the time of Chapman's offense, is irrelevant to the self-governing prerogatives of the Band to not regulate a particular activity.[1] It is an overly narrow application of the Supreme Court's tribal sovereignty analysis.

In *McClanahan,* the Supreme Court held that an Arizona state income tax was unlawful as applied to reservation Indians. As it was to repeat later in *Rice,* the Court stressed that its pre-emption analysis took, as a backdrop, the tradition of Indian sovereignty. 411 U.S. at 172–73. It is clear from the *McClanahan* opinion that the "tradition of sovereignty" to which the Supreme Court was referring was the Indians' historical claim to sovereignty " 'as a separate people, with the power of regulating their internal and social relations.' " *McClanahan,* 411 U.S. at 173 (quoting *United States v. Jagama,* 118 U.S. at 381–82). The *McClanahan* Court did not inquire whether the Navajo tribe had its own

---

[1] It should be noted, however, that it is implicit in the rationale of the majority that, whenever the Band undertakes traffic regulation and enforcement, the state's jurisdiction in that respect is ousted.

system of income taxation, as the analysis of the majority of this court would do.

In *Rice,* the Supreme Court found that there was no tradition of tribal sovereignty in the area of liquor sales regulation, not because there was no evidence that the Pala tribe had undertaken to regulate liquor sales,[2] but rather because federal control of liquor on reservations has been pervasive and comprehensive. 103 S. Ct. at 3296–97. The *Rice* Court stressed the unique history of "congressional divestment of tribal self-government" in the "narrow context of the regulation of liquor" beginning in colonial days and affecting all tribes. *Id.*

I find no similar comprehensive divestment of traditional tribal sovereignty in the area of traffic regulation or similar safety or social regulations. I find nothing to justify the conclusion that the Lac du Flambeau Band has no historical claim to sovereignty and self-regulation in this area. Accordingly, I dissent from the majority opinion.

Under the *Rice* analysis, which the majority and I both take to be the controlling analysis, a finding that the Lac du Flambeau Band has an unimpaired right of self-regulation in the area of traffic offenses leads to the conclusion that the state, through Vilas county, would have jurisdiction to enforce its traffic regulations only if Congress expressly granted the state this authority. *Rice,* 103 S. Ct. at 3296. The parties agree, and the majority acknowledges, that the applicable congressional enactment, Pub. L. 280, enacted, as amended in 18 U.S.C. sec. 1162 (1982), does not expressly grant the state the authority to regulate traffic within the Lac du Flambeau reservation. (At 217.) Consequently, I would affirm the decision of the court of appeals that Vilas county

---

[2] The contrary was in fact shown; the Pala tribe has adopted a tribal ordinance regarding the sale of liquor on the reservation. 103 S. Ct. at 3293.

does not have jurisdiction to enforce its traffic ordinance against an enrolled member of the Lac du Flambeau Band on the Band's reservation.

JUSTICE SHIRLEY S. ABRAHAMSON joins in this dissent.